1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CALIFORNIA RESOURCES AGENCY, et al.,

        Plaintiffs,

  v.

UNITED STATES DEPARTMENT OF AGRICULTURE, et al.,

        Defendants.

——————————————————————

CENTER FOR BIOLOGICAL DIVERSITY, et al.,

        Plaintiffs,

  v.

UNITED STATES DEPARTMENT OF AGRICULTURE, et al.,

        Defendants.

——————————————————————/

No. C 08-1185 MHP

No. C 08-3884 MHP

**MEMORANDUM & ORDER**

**Re: Cross-Motions for Summary Judgment**

      In these consolidated cases, the State of California and several environmental organizations challenge the Environmental Impact Statement ("EIS") supporting the United States Forest Service's promulgation of Land Management Plans ("forest plans") for the four national forests located in southern California: Angeles National Forest, Cleveland National Forest, Los Padres National Forest and San Bernardino National Forest (collectively, "the four forests"). The State of California plaintiffs include the California Natural Resources Agency,[1] the California Department of Forestry

and Fire Protection, and the People of the State of California ex rel. Attorney General Edmund G.

Brown, Jr. (collectively "California").  The private plaintiffs are the Center for Biological Diversity,

Los Padres ForestWatch, Defenders of Wildlife, California Native Plant Society, California

Wilderness Coalition, and The Wilderness Society (collectively "environmental plaintiffs").

Defendants are the U.S. Department of Agriculture, Secretary of Agriculture Thomas Vilsack,[2] the

U.S. Forest Service, U.S. Forest Service Chief Abigail Kimbell, and Regional Forester for the

Pacific Southwest Region Randy Moore (collectively, "the Forest Service").

California and environmental plaintiffs allege that the Forest Service violated the National

Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq., by adopting the revised forest plans

with inadequate environmental review.  Additionally, California alleges a procedural violation of the

National Forest Management Act (NFMA), see 16 U.S.C. § 1604(a), asserting that the Forest

Service failed to adequately coordinate with California's land and resource management processes.

The parties have filed cross-motions for summary judgment.  Having considered the parties'

arguments and submissions, the court enters the following memorandum and order.

BACKGROUND

I.      The Four Forests

The four forests include over 3.5 million acres of federally-managed public land covering

parts of ten counties and extending from Big Sur in the north to the Mexican border in the south.

See Administrative Record ("AR") 4.4.1.5 ("Final Environmental Impact Statement" or "FEIS"),

vol. 1 at 7.[3]  There is a great deal of geologic, topographic and climatic diversity in the four forests,

creating a correspondingly high level of vegetative and animal diversity.  Id. at 109.  The forests

contain a wide range of habitats for wildlife: from alpine and subalpine areas to desert scrub, and

from mountain conifer forests to chaparral.  See id. at 83-108.  As of 2004, sixty-two listed

threatened and endangered species could be actually or potentially found in the four forests.

AR 4.4.3.2 ("Forest Plans, Part 1") at 14.

2

The forests are under increasing pressure from urbanization. Id. at 9-10. The Angeles and San Bernardino National Forests are virtually surrounded by urban development, and the level of development adjacent to the Cleveland and Los Padres National Forests continues to grow at a steady pace. Id. Approximately 31 million people live near, visit or influence the four forests, and most of them are within a one-hour driving time. FEIS, vol. 1 at 8. The forests serve the public as an open space, visual background, recreation destination and natural environment. Forest Plans, Part 1 at 7. The Los Padres National Forest is the principal home of the endangered California Condor and the site of an effort to bring the species back from the brink of extinction. See AR 4.4.2.17 ("Oil and GAS FEIS") at 48.

A particular area in a national forest may be dedicated to one or more of a variety of potential uses. The Secretary of Agriculture, through the Forest Service, has a statutory obligation to balance and coordinate the various uses of the national forests, including "outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." 16 U.S.C. § 1604(e)(1).

II.     Genesis of the 2005 State Petitions Rule

In January 1998, the Forest Service proposed an interim rule that would temporarily suspend road construction and reconstruction in most roadless areas of the national forests. 63 Fed. Reg. 4351 (Jan. 28, 1998). The interim roadless rule was ultimately promulgated on March 1, 1999. 64 Fed. Reg. 7290 (Feb. 12, 1999). It established an eighteen-month moratorium on road construction and reconstruction in roadless areas in order to retain resource management options while the Forest Service studied a more permanent strategy for roadless areas. Id. In 2001, the Forest Service promulgated a final Roadless Area Conservation Rule ("the 2001 Roadless Rule"). 66 Fed. Reg. 3244 (Jan. 12, 2001); AR 7.5.1.1. That rule prohibited road construction and reconstruction, as well as timber harvest, within designated inventoried roadless areas (IRAs) on a nation-wide basis, with certain exceptions. Id. In southern California, existing IRAs total approximately 1.1 million acres, or about thirty-two percent, of the total National Forest System lands. FEIS, vol. 1 at 66.

The 2001 Roadless Rule was immediately challenged in federal courts in several western states and the District of Columbia. On May 10, 2001, two days before the rule was to take effect,

the U.S. District Court for the District of Idaho preliminarily enjoined implementation of the rule. Kootenai Tribe of Idaho v. Veneman, 142 F. Supp. 2d 1231 (D. Idaho 2001). The U.S. Court of Appeals for the Ninth Circuit reversed the grant of the preliminary injunction in December 2002. Kootenai Tribe of Idaho v. Veneman, 313 F.3d 1094, 1107 (9th Cir. 2002). In July 2003, the U.S. District Court for Wyoming set aside and permanently enjoined the 2001 Roadless Rule. Wyoming v. U.S. Dep't of Agric., 277 F. Supp. 2d 1197 (D. Wyo. 2003). The U.S. Court of Appeals for the Tenth Circuit vacated the injunction as moot in July 2005 because by that time the Forest Service had announced a proposal to replace the 2001 Roadless Rule. Wyoming v. U.S. Dep't of Agr., 414 F.3d 1207, 1212 (10th Cir. 2005).

The new rule proposed by the Forest Service ("the 2005 State Petitions Rule") created "a petitioning process that will provide Governors an opportunity to seek establishment of or adjustment to management requirements for National Forest System inventoried roadless areas within their States." 70 Fed. Reg. 25654 (May 13, 2005). Under the 2005 State Petitions Rule, states were invited to develop and submit a petition seeking to adjust the management requirements for the roadless areas within their respective states. Id. The opportunity to submit such a petition was available for eighteen months, until November 13, 2006. Id. at 25661. On October 11, 2006, this court set aside the 2005 State Petitions Rule, reinstated the 2001 Roadless Rule, and enjoined the Forest service "from taking any further action contrary to the Roadless Rule without undertaking environmental analysis consistent with this opinion." California ex rel. Lockyer v. U.S. Dep't of Agric., 459 F. Supp. 2d 874, 919 (N.D. Cal. 2006) (Laporte, Mag. J.), aff'd, 575 F.3d 999 (9th Cir. 2009). The 2005 State Petitions Rule was in place when the FEIS at issue in this action was issued and later reissued.

III.    Adoption of the Forest Plans and Communications Between Federal and State Officials

In September 2001, the Forest Service published a notice of intent to revise the forest plans for the four forests and prepare an accompanying EIS. 66 Fed. Reg. 48856 (Sept. 24, 2001). The purpose of the forest plans, which are programmatic or second-level plans, is to "describe the strategic direction at the broad program-level for managing the land and its resources over the next

4

10 to 15 years." Forest Plans, Part 1 at 1. In response to the notice, several environmental groups, including environmental plaintiffs, developed a comprehensive "Conservation Alternative" for evaluation in the forest plans' EIS. AR 3.2.4.40 ("Conservation Alternative"). In May 2004, the Forest Service requested public comment on the draft forest plans and EIS. Case No. C 08-3884, Docket No. 13 (Def.'s Answer) ¶ 60; AR 3.5.1.1. The public comment period closed on August 11, 2004. AR 3.2.6.5.

On November 15, 2004, California's Secretary for Resources, Mike Chrisman, wrote a letter to the U.S. Secretary of Agriculture, Ann Veneman. Case No. C 08-1185, Docket No. 1 (Cal. Compl.), Exh. A. This letter stressed the importance to California of the 4.4. million acres of roadless area in the state and also emphasized the need for "closer partnerships with states." Id. The letter stated that California would not take advantage of the petition process that had been offered to it but rather would "work[] closely with the individual National Forest representatives as they revise the land management plans in future years." Id. Additionally, Chrisman's letter made several substantive points for Veneman's consideration. Chrisman largely re-stated these points in a January 24, 2005, letter to Regional Forester Jack Blackwell. Id., Exh. B. Specifically, Chrisman wrote:

> The Region 5 Roadless Areas should be governed by the following principles:
> 1.    The USFS Chief should have no greater discretion than the Regional Forester or Forest Supervisor in approving or disapproving road construction or reconstruction in inventoried roadless areas.
> 2.    Maps of IRAs need to be updated and shared with the State to confirm that the maps accurately reflect current conditions.
> 3.    Where roads exist in IRAs, we must conduct thoughtful, common sense-based reviews of whether these roads should be actively managed or decommissioned. For example, roads that provide access for Native American Tribes to widely acknowledged sacred sites or meet legitimate public safety objectives or well-managed recreational use should be actively managed. Roads that cannot be managed to mitigate sedimentation in sensitive watersheds should be decommissioned.
> 4.    Roadless status limitations should not compromise our fire fighting efforts consistent with existing authority.

Id. Chrisman noted at the outset of the letter that "USFS Interim Directive 1920-2004-1, that provides guidance for addressing road and forest management activities in inventoried roadless areas, is set to expire January 2006." Id. After stating the four policy points listed above, Chrisman

wrote, "We believe that California's interests are best served when <u>truly roadless areas remain</u>

<u>roadless</u>. However, unlike wilderness areas, a multitude of activities like those mentioned above are

allowed in roadless areas so long as new roads are not created for such activities." <u>Id.</u> (underlining

in original). On January 27, 2005, Blackwell replied to Chrisman's letter. <u>Id.</u>, Exh. C. Among

other things, he stated, "With respect to the four changes you request for interim roadless protection,

we can agree with each." <u>Id.</u>

Secretary Chrisman wrote a letter to the forest supervisors of the four forests on July 6, 2005,

specifically mentioning the land management plans for the four forests. <u>Id.</u>, Exh. E. Chrisman noted

that the new forest plans did not contain plans for the construction of new roads in the IRAs but that

the Forest Service intended to soon develop a plan for undertaking a mixture of road closures,

upgrades and new construction. Chrisman asked that he have an opportunity for meaningful

participation in any decision that might result in the construction of new roads in designated IRAs.

On September 20, 2005, the Forest Service's Regional Forester issued the forest plans, the

FEIS and records of decision for each national forest. Def.'s Answer ¶ 62. These were later

withdrawn because the Forest Service had inadvertently omitted information from the FEIS. <u>Id.</u>

Following this withdrawal, on March 15, 2006, Chrisman wrote to the new Regional Forester,

Bernard Weingardt, asking that Weingardt address certain concerns regarding the plans' land

designations before re-issuing them. Cal. Compl., Exh. F. Chrisman wrote that he had learned the

Forest Service was planning to implement certain projects that would require building roads in

IRAs, and that information about these projects should have been presented to the public in the

course of developing the forest plans and the FEIS. Chrisman stated that, in light of the information

currently available, he was concerned that the forest plans did not protect IRAs as required by the

commitments undertaken in Forester Blackwell's January 27, 2005, letter. Chrisman asked that the

Forest Service take immediate steps to ensure that all IRAs would be protected in the manner set

forth in Blackwell's letter. <u>See</u> <u>id.</u>

On April 3, 2006, the Forest Service reissued the records of decision because the agency had

inadvertently omitted information from the FEIS. Def.'s Answer ¶ 62. The following day, Regional

Forester Weingardt replied to Chrisman's March 15 letter. Weingardt affirmed that the Forest Service planned to follow the guidance in Interim Directive 1920-2004-1, as amended by the four changes stated in Chrisman's January 24, 2005, letter. Cal. Compl., Exh. G. Weingardt also noted that the Forest Service had also committed to developing a roadless rule "that fully protects roadless values at least as successfully as the Interim Directive and in a fashion that meets the State's goals for the protection of wild areas in California." Id. According to Weingardt, the State Petitions Rule adopted in May 2005 fulfilled that commitment. Weingardt also stated that the Forest Service would continue to respect the prohibition on road construction and reconstruction set forth in the Interim Directive until the petition rule was completed and a final rule promulgated.

IV.     Structure of the Forest Plans

        Part 1 of the forest plans, which applies to all four forests, is intended to serve as the "vision" for the four forests; it includes goals, unique characteristics of the forest, the desired conditions of the forests, and the indicators that will be used to monitor and evaluate progress toward achieving the desired conditions. AR 4.4.3.2 (Forest Plans, Part 1). Part 2 comprises a separate document for each of the forests and includes descriptions of objectives, program emphases, potential resource management strategies, and land use zones for the four national forests. See, e.g., AR 4.4.3.4 (Forest Plans, Part 2, for the Cleveland National Forest). Part 3 contains the "design criteria" that apply to all four forests, comprising laws, guidelines, policies, management standards and other direction that may be necessary for land managers to consult during the course implementing the forest plans. AR 4.4.3.7 (Forest Plans, Part 3).

V.      Procedural History

        California filed its complaint on February 28, 2008, and environmental plaintiffs filed their complaint on August 14, 2008. The court related the two cases on August 20, 2008. Following stipulated continuances, the parties filed cross-motions for summary judgment. These motions were heard on July 31, 2009.

1  <u>LEGAL STANDARDS</u>

2  I.      <u>National Forest Management Act (NFMA)</u>

3          The NFMA directs the Secretary of Agriculture, by and through his designee, the Forest

4  Service, to "develop, maintain, and, as appropriate, revise land and resource management plans for

5  units of the National Forest System." 16 U.S.C. § 1604(a). In carrying out its management

6  directive, the Forest Service employs a three-tiered process. <u>See generally</u> <u>id.</u> § 1604; 36 C.F.R. §

7  219.2. At the highest tier, the Chief of the Forest Service promulgates national uniform regulations

8  that set broad guidelines to which subsequent management plans must conform. 36 C.F.R. §

9  219.2(a). At the next tier, the Forest Service prepares regional land and resource management plans

10 ("LRMPs") that cover particular national forest "units." 16 U.S.C. § 1604(a). Such second-tier

11 plans are produced by the supervisor of the national forest, grassland, prairie or other comparable

12 administrative unit. 36 C.F.R. § 219.2(b). These "forest plans" are broad, programmatic planning

13 documents that guide all natural resource management activities and must provide for multiple uses

14 of the land. <u>See</u> <u>id.</u> at § 1604(e)(1); 36 C.F.R. § 219.1(b); <u>see also</u> <u>Wilderness Soc'y v. Thomas</u>, 188

15 F.3d 1130, 1132 (9th Cir. 1999). The final tier of the process is the implementation stage "during

16 which individual site specific projects, consistent with the forest plan, are proposed and assessed."

17 <u>Ecology Ctr., Inc. v. U.S. Forest Serv.</u>, 192 F.3d 922, 924 n.2 (9th Cir. 1999); <u>see also</u> 16 U.S.C. §

18 1604(i).

19         The NFMA provides: "[T]he Secretary of Agriculture shall develop, maintain, and, as

20 appropriate, revise land and resource management plans for units of the National Forest System,

21 coordinated with the land and resource management planning processes of State and local

22 governments and other Federal agencies." <u>Id.</u> § 1604(a) (emphasis added).

23 II.     <u>National Environmental Policy Act (NEPA)</u>

24         The NEPA "is our basic national charter for protection of the environment." <u>Klamath-</u>

25 <u>Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.</u>, 387 F.3d 989, 993 (9th Cir. 2004) (quoting 40

26 C.F.R. § 1500.1(a)). It requires the preparation of an EIS for "major Federal actions significantly

27 affecting the quality of the human environment." 42 U.S.C. § 4332(C). "NEPA's purpose is

28

8

realized not through substantive mandates but through the creation of a democratic decisionmaking structure that, although strictly procedural, is 'almost certain to affect the agency's substantive decision[s].'" <u>Oregon Natural Desert Ass'n v. Bureau of Land Mgmt.</u>, 531 F.3d 1114, 1120 (9th Cir. 2008) (alteration in original) (quoting <u>Robertson v. Methow Valley Citizens Council</u>, 490 U.S. 332, 350 (1989)). The NEPA has twin aims: "ensur[ing] that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts;" and "guarantee[ing] that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." <u>Id.</u> (quoting <u>Dep't of Transp. v. Public Citizen</u>, 541 U.S. 752, 768 (2004)). The NEPA does not contain substantive environmental standards; rather, it "establishes 'action-forcing' procedures that require agencies to take a 'hard look' at environmental consequences." <u>Kern v. Bureau of Land Mgmt.</u>, 284 F.3d 1062, 1066 (9th Cir. 2002). "NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action." <u>Oregon Natural Desert Ass'n</u>, 531 F.3d at 1120 (quoting 40 C.F.R. § 1500.1(c)).

"To fulfill its purpose, an EIS must provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." <u>Id.</u> at 1121 (citation and internal quotation marks omitted); <u>see also</u> 42 U.S.C. § 4332(C) (enumerating EIS requirements). "To fulfill this mandate, agencies must consider every significant aspect of the environmental impact of a proposed action in an EIS, including the direct, indirect, and cumulative impact of the action." <u>Oregon Natural Desert Ass'n</u>, 531 F.3d at 1121 (citations and internal quotation marks omitted). Regulations implementing the NEPA are issued by the Council on Environmental Quality (CEQ). <u>See</u> 40 C.F.R. § 1500.3.

III.    <u>Administrative Procedure Act</u>

Judicial review of an agency's compliance with the NEPA and the NFMA is governed by the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.* <u>See</u> <u>Oregon Natural Desert Ass'n</u>, 531 F.3d at 1130 (NEPA); <u>Oregon Natural Res. Council v. Lowe</u>, 109 F.3d 521, 526 (9th Cir. 1997)

(NFMA).  Under the APA, an agency action or decision may be set aside if the court finds it to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  A court may also "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).  A court's inquiry under the APA must be "searching and careful," but the standard of review is ultimately narrow.  Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 378 (1989) (citations and internal quotation marks omitted).

IV.     Summary Judgment

Judgment on an administrative record is a form of summary judgment.  Oregon Natural Desert Ass'n, 531 F.3d at 1129.  Summary judgment may be granted only when, drawing all inferences and resolving all doubts in favor of the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see generally Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-255 (1986).  A fact is "material" if it may affect the outcome of the proceedings, and an issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson, 477 U.S. at 248.  The moving party bears the burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party meets its initial burden, the non-moving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is a genuine issue for trial.  Fed R. Civ. P. 56(e); see Anderson, 477 U.S. at 250.  The court may not make credibility determinations, and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party.  Id. at 255; see also Masson v. New Yorker Magazine, 501 U.S. 496, 520 (1991).


DISCUSSION

I.      NFMA Challenge

California alleges the Forest Service failed to explicitly review state forest planning policy and coordinate its forest planning with that of the State.  The Forest Service allegedly failed to

10

1   include in the FEIS any discussion of California's policy on roadless areas, in violation of the

2   applicable regulations. According to California, this failure constitutes a violation of the NFMA.

3   See 16 U.S.C. § 1604(a). The Forest Service responds by challenging California's standing to bring

4   an NFMA claim. The Forest Service also argues that the Forest Service coordinated with state

5   policy in a manner sufficient to meet section 1604(a)'s requirements. The forest plans at issue in

6   this lawsuit are governed by the planning rule promulgated in 1982. See 66 Fed. Reg. at 48856;

7   Forest Plans, Part 1 at 4.

8        A.      Justiciability

9        According to the Forest Service, California's NFMA claim is not justiciable because

10  California lacks standing and the claim is not ripe. To have standing to seek injunctive relief, "a

11  plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and

12  particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be

13  fairly traceable to the challenged action of the defendant; and it must be likely that a favorable

14  judicial decision will prevent or redress the injury." Summers v. Earth Island Institute, ___ U.S.

15  ___, ___, 129 S.Ct. 1142, 1149 (2009) (citing Friends of Earth, Inc. v. Laidlaw Envtl. Servs. (TOC),

16  Inc., 528 U.S. 167, 180-181 (2000)). Injury in fact is "a hard floor of Article III jurisdiction that

17  cannot be removed by statute." Id. at 1151. "Environmental plaintiffs seeking to enforce a

18  procedural requirement the disregard of which could impair a separate concrete interest of theirs can

19  establish standing without meeting all the normal standards for immediacy." Citizens for Better

20  Forestry v. U.S. Dep't of Agric., 341 F.3d 961, 972 (9th Cir. 2003) (citations, internal quotation

21  marks and ellipses omitted). They need only establish "the reasonable probability of the challenged

22  action's threat to their concrete interest." Id. (citation and internal quotations omitted). Once a

23  plaintiff has established a procedural injury in fact, the causation and redressabililty requirements

24  are relaxed. See id. at 975 (9th Cir. 2003); see also Earth Island, 129 S.Ct. at 1151.

25       The Forest Service argues that California has not shown how the alleged violation of its

26  procedural rights concretely threatens imminent harm to any interest of the State. The Forest

27  Service relies upon the Supreme Court's recent decision in Earth Island. In that case, several

28

11

environmental groups brought an action seeking to enjoin the Forest Service from applying its regulations to exempt a salvage sale of timber on 238 acres of federal land damaged by fire—the so-called "Burnt Ridge timber sale"—from the Forest Services's normal notice, comment and appeal process. 129 S.Ct. 1147-1148. The district court granted a preliminary injunction against the Burnt Ridge timber sale, and the parties thereafter settled their dispute over that project. Id. at 1148. Despite the absence of an actual controversy concerning a specific project, the district court adjudicated the merits of the plaintiffs' claims, invalidated five challenged regulations, and entered a nationwide injunction against their application. The Ninth Circuit partially reversed and partially affirmed. Id. The Supreme Court held that the plaintiffs did not have standing to challenge any of the regulations, because "the deprivation of a procedural right in vacuo is insufficient to create Article III standing." Id. at 1151. The Court found that the plaintiffs had not sufficiently established an injury. The court noted that the plaintiffs had challenged planning regulations, which affected how Forest Service officials engaged in project planning but did not make the plaintiffs themselves "the object of government action or inaction." Id. at 1149. In such a case, standing is not precluded; however, it is ordinarily "substantially more difficult" to establish. Id. (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 562 (1992)). While acknowledging that even injury to mere esthetic interests would suffice, id., the Earth Island court found that the plaintiffs' affidavits were inadequate to show any real interest or imminent injury. One affidavit had dealt with the Burnt Ridge sale, which was no longer at issue; the only other timely-filed affidavit merely attested that a group member "plans to visit several unnamed National Forests in the future." Id. at 1150. The Court characterized these plans as "'some day' intentions" that were insufficient to show an injury to the affiant resulting from the Forest Service's application of its regulations. Id. at 1151.

The Earth Island case is consistent with the Ninth Circuit rule that the touchstone for injury in environmental cases is the geographical proximity to and use of areas that will be affected by the agency's policy. See Citizens for Better Forestry, 341 F.3d at 971. Notably, the Earth Island case did not involve a state plaintiff. California is not merely geographically proximate to the areas at issue—those areas are within its boundaries. In a case involving a challenge to a Forest Service

decision to allow logging in the Sierra Nevada Forest, the Ninth Circuit held that "'special solicitude' should be afforded California's stake in its natural resources." Sierra Forest Legacy v. Rey, 526 F.3d 1228, 1234 (9th Cir. 2008) (quoting Massachusetts v. Envtl. Prot. Agency, 549 U.S. 497, 127 S.Ct. 1438, 1454-55 (2007) (holding Massachusetts had standing to challenge an order denying a petition for rulemaking to regulate greenhouse gas emissions from motor vehicles under the Clean Air Act)). Congress plainly recognized and endorsed the respective states' interests in the management of national forests by enacting the provision of the NFMA requiring the Forest Service to coordinate forest planning with state resource management processes. See 16 U.S.C. § 1604(a). In light of this statutory recognition, it would be odd indeed to hold that California has no concrete interest in activities in the national forests. California has a concrete interest in the management of national forests within its borders.[4]

California also meets the other requirements for standing. There is a reasonable probability that the forest plans will impact California's concrete interest, for the same reasons articulated by the Ninth Circuit in Idaho Conservation League v. Mumma, 956 F.2d 1508 (9th Cir. 1992); see also Citizens for Better Forestry, 341 F.3d at 972-975. In Idaho Conservation League, as here, the Forest Service argued that the effect of the challenged action, a land resource management plan for the Idaho Panhandle Forest, was too remote to sustain standing because further analysis would be conducted for all projects at the site-specific level before they were undertaken. 956 F.2d at 1515. The court dealt with this argument as follows:

> The [plaintiff]'s complaint is that the faulty EIS has made possible development that wilderness designation would have prevented. Pursuant to NEPA and the NFMA, these are injuries that we must deem immediate, not speculative. Indeed, short of assuming that Congress imposed useless procedural safeguards, and that wilderness designation is a superfluous step, we must conclude that the management plan plays some, if not a critical, part in subsequent decisions.

Id. at 516 (emphasis in original). Or, as the Citizens for Better Forestry court held, "[E]nvironmental plaintiffs have standing to challenge not only site-specific plans, but also higher-level, programmatic rules that impose or remove requirements on site-specific plans." 341 F.3d at 975. Causation also presents no impediment to California, because there is no question that the alleged injury is dependent upon the agency's policy rather than independent incentives governing a

13

third-party's decision-making process. See id. California also meets the relaxed redressability requirements: Action by the court setting aside the FEIS would remedy the harm that petitioner asserts, because the agency's decision could be influenced by the environmental considerations the agency would then be required to study. See id. at 976. California has standing.

To be justiciable, a claim must also be ripe for adjudication. The Supreme Court has articulated a three-pronged test for ripeness of an administrative challenge: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." Citizens for Better Forestry, 341 F.3d at 976-977 (quoting Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 733 (1998)). The Forest Service notes that the Supreme Court held a challenge to the substance of a programmatic LRMP to be unripe in Ohio Forestry because the LRMP "[did] not command anyone to do anything or to refrain from doing anything . . . [and did] not give anyone a legal right to cut trees . . . ." 523 U.S. at 733. Because any decision to cut trees would require the proposal of a specific site and harvesting method, preparation of an EIS, opportunity for the public to be heard, and justification in court, the Court found the harm to the environmental plaintiffs to be too uncertain. Id. at 734. According to the Forest Service and an amicus, Ohio Forestry controls the instant case: Since an NFMA challenge to a programmatic LRMP was held to be unripe in Ohio Forestry, California's instant challenge must also be unripe.

This argument ignores the fact that the Ohio Forestry plaintiffs brought a challenge to the substance of the Forest Service's decision, whereas California has in this action chosen only to bring a procedural claim. California does not argue that the Forest Service violated the NFMA because of the decisions it made; rather, it argues that the Forest Service violated NFMA's procedural mandate to "coordinate[] with the land and resource management planning processes of [the] State." 16 U.S.C. § 1604(a). The Ohio Forestry court found the plaintiffs' substantive NFMA claims to be unripe; however, it made it clear that a procedural challenge to an LRMP under the NEPA would not be held unripe. This distinction hinged not on the difference between the LRMP and NEPA as such,

14

but rather on the distinction between a substantive and a procedural challenge: ". . . NEPA, unlike

the NFMA, simply guarantees a particular procedure, not a particular result. . . . Hence a person with

standing who is injured by a failure to comply with the NEPA procedure may complain of that

failure at the time the failure takes place, for the claim can never get riper." Id. at 737. The holding

and rationale of Ohio Forestry supports the conclusion that California's procedural NFMA claim is

ripe for adjudication—here too the claim can never get riper. California has already suffered its

alleged procedural injury, so delayed review would cause legal hardship to the State.

The other ripeness factors also favor review. The forest plans have already been published,

and the Forest Service does not contend that judicial intervention would inappropriately interfere

with further administrative action. Furthermore, the court has been presented with a complete

administrative record concerning the development of the FEIS; there is no reason to believe the

court would benefit from further factual development of the issues presented. See Citizens for

Better Forestry, 341 F.3d at 976-977. In summary, California's NFMA claim is ripe for

adjudication.[5]

    B.    Merits

California alleges the Forest Service failed to adequately coordinate forest planning with

state policies, as required by 16 U.S.C. section 1604(a) and 36 C.F.R. section 219.7(c) (1982).

According to California, the Forest Service simply ignored the State's policy for roadless areas in

California. The Forest Service contends that the statutory obligation to "coordinate" does not

require the Forest Service to adopt the State's position and that the coordination was adequate.

Section 1604(a) plainly does not require the Forest Service to adopt a state's position, and

California does not contend otherwise. The ultimate decision-making authority for land

management of these federal forests lies with the federal government, not the State; however, the

federal agency must exercise this authority consistent with federal law. The Forest Service argues

that section 1604(a) creates merely an amorphous duty to "talk to state entities and consider their

views." Case No. C 08-1185, Docket No. 50 (Def.'s Mot./Opp.) at 16. According to the Forest

Service, California's interpretation to the contrary must be rejected under Chevron U.S.A., Inc. v.

15

1    Natural Res. Def. Council, 467 U.S. 837, 842-45 (1984), and its progeny. The Forest Service errs in

2    this contention, because an agency's interpretation of a statute proffered in the course of litigation is

3    not subject to Chevron deference. Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 212-213

4    (1988).[6] The Forest Service's authoritative interpretation of section 1604(a) derives not from the

5    arguments of counsel in this case but from the regulations the agency promulgated to implement the

6    statute.[7] Those regulations require a number of specific actions, including: giving notice to state

7    agencies, 36 C.F.R. § 219.7(b) (1982); reviewing the State's planning and land use policies and

8    documenting the results of such review, id. § 219.7(c); meeting with responsible state officials, id.

9    § 219.7(d); seeking state input regarding management concerns and areas where additional research

10   is needed; id. § 219.7(e); and giving consideration to the effects of National Forest management on

11   nearby lands, including those managed by the State, id. § 219.7(f).

12           The court finds that the Forest Service failed to meet only the specific requirement set forth

13   in 36 C.F.R. section 219.7(c) of the 1982 regulations mandating that the Forest Service "display[]"

14   in the EIS the results of its review of the planning and land use policies of the affected state

15   government. The review itself must include: "(1) Consideration of the objectives of other Federal,

16   State and local governments, and Indian tribes, as expressed in their plans and policies; (2) An

17   assessment of the interrelated impacts of these plans and policies; (3) A determination of how each

18   Forest Service plan should deal with the impacts identified; and (4) Where conflicts with Forest

19   Service planning are identified, consideration of alternatives for their resolution."[8] 36 C.F.R.

20   § 219.7(c) (1982). The Forest Service does not dispute California's assertion that the FEIS fails to

21   display any result of its review of California's planning and land use policies. The Forest Service

22   instead argues that California did not properly engage in the coordination process. The first time

23   California specifically expressed concerns over the management of IRAs in the four forests was in a

24   July 6, 2005, letter, many months after the public comment period for the draft EIS had ended.[9] By

25   that time, the 2005 State Petitions Rule was in place. The Forest Service contends that it reasonably

26   expected California to follow the procedures set out in that rule for the lodging of any complaints

27   about the forest plans. For its part, California states that it did not want to invoke the State Petitions

28
                                                    16

1  Rule at that time, apparently because there was "no guarantee that the State's petition would be

2  accepted or that California's suggested rule would be adopted." Case No. C 08-1185, Docket No. 52

3  (Cal. Opp.) at 10. California did ultimately invoke the State Petitions Rule to appeal the final forest

4  plans and FEIS, after they were reissued.

5      Even if the Forest Service's review of California's policy was impeded by California's

6  failure to fully engage in the planning process, the rule nevertheless required the Forest Service to

7  display the results of its review, however impeded. Secretary Chrisman had provided at least some

8  general policy statements to the Forest Service, and the Forest Service had coordinated with state

9  officials. The results of the Forest Service's review of state input should have been displayed in the

10 FEIS, even if part of the discussion would have consisted of noting that the State had not fully

11 engaged in the process established by the 2005 State Petitions Rule, the lawful process at the time.

12 The failure to provide any discussion of input from the State, or at least of the State's failure to fully

13 engage in the planning process, was a violation of the NFMA. This is more than a merely technical

14 violation, as it significantly inhibits the public's ability to understand the competing priorities of the

15 Forest Service and the State.

16     Aside from the failure to meet section 219.7(c)'s "display" requirement, the FEIS meets the

17 requirements of 1604(a) and the implementing regulations. The Forest Service has noted that it

18 collected a number of comments from state and local government agencies. See AR 3.6.5.1,

19 Letter_Log.xls (list of letters received, including ten letters from state entities). The Forest Service

20 also made extensive note of related local and state planning efforts in several affected counties. See

21 AR 3.2.3.10 (list of "[o]ther agency planning efforts" relating to Cleveland National Forest, as of

22 December 2003). Forest Service officials held a January 6, 2006, meeting with state officials in

23 which the latter expressed a variety of concerns regarding the forest plans and the issue of roadless

24 areas more generally. See A.R. 2.2.2.5 (report from meeting). This meeting occurred after the

25 initial version of the FEIS and forest plans had been issued in September 2005 but before the revised

26 versions had been reissued in April 2006. The record also reveals that the Forest Service has

27

28
                                          17

1    exchanged a number of e-mails with state officials pertaining to the forest plans. This level of

2    coordination is significant although not extensive.

3        California argues that the Forest Service ignored the State's policy on roadless areas;

4    however, the letters submitted into evidence by California do not reveal a clear policy regarding the

5    treatment of roadless areas in the forest plans. The letters Secretary Chrisman sent to federal

6    officials contained broad slogans, e.g., "truly roadless areas [should] remain roadless," but list only

7    four substantive, albeit quite general, points. Moreover, the letters and the subsequent agreement by

8    the Forest Service to follow Chrisman's four points do not specify that the concerns or agreement

9    pertain to the forest plans themselves rather than to specific activities under the interim roadless rule

10   then in place. California has failed to point to any policy more specific than the four points

11   articulated in Chrisman's January 2005 letter to the Regional Forester. California did ultimately

12   articulate specific policy recommendations regarding roadless areas, timber harvesting and other

13   issues, which the State submitted with its July 12, 2006, petition to the U.S. Secretary of

14   Agriculture; however, the FEIS had already been reissued by that time. The absence of a clearly

15   articulated policy at the time the forest plans and FEIS were issued undermines California's

16   contention that the Forest Service ignored such policy. While California may disagree with the

17   decisions reached by the Forest Service, it cannot be held that the level of coordination with the

18   State warrants finding a violation of the NFMA except insofar as section 219.7(c) was violated as

19   described above.

20   II.    NEPA Challenges

21       Plaintiffs bring several challenges to the FEIS based upon the Forest Service's alleged failure

22   to comply with the requirements of the NEPA. California and environmental plaintiffs both allege

23   that the FEIS does not include an adequate analysis of the decisions pertaining to roadless areas and

24   wilderness designations. They both also allege that the FEIS does not identify or analyze a

25   reasonable range of alternatives as required by the NEPA, and that the FEIS fails to address the

26   adverse impacts of expanding the use of off-highway vehicles in the four forests. Additionally,

27   California asserts that the FEIS inadequately analyzes the impacts of potential oil and gas

28
                                              18

**United States District Court**
For the Northern District of California

exploration on the endangered California Condor, while environmental plaintiffs assert that the FEIS inadequately analyzes the impacts of the forest plans' approach to fuels reduction activities.

The Forest Service disputes each of these allegations, arguing that the FEIS's analysis pertaining to each of these issues is sufficient to meet the NEPA's requirements. The Forest Service concedes that forest plans are subject to the requirements of the NEPA and that the publication of a the FEIS for the four forests constituted a "final agency action" for the purposes of the APA.

A.      Roadless Areas and Wilderness Designation Decisions

The forest plans make the critical programmatic decision about how the four forests are to be allocated among various land use zones. Some land use zones allow for the construction and reconstruction of roads, while others do not. The construction of roads is a key factor affecting whether an area retains its wilderness character, as roads facilitate encroachment by humans, non-native plants and other harmful phenomena. See FEIS, vol. 1 at 519. In addition to setting forth land use zones, forest plans also indicate how many and which areas of the national forests to recommend for wilderness designation. Wilderness designation is governed by the provisions of the Wilderness Act of 1964. The purpose of that statute was "to secure for the American people of present and future generations the benefits of an enduring resource of wilderness." 16 U.S.C. § 1131(a). Wilderness is defined in the statute to mean "an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain." Id. § 1131(c). The Wilderness Act authorizes the Secretary of Agriculture to review primitive and roadless areas and recommend to the President and Congress areas of the national forests that should be preserved as wilderness areas. Id. § 1132(b) & (c).

Decisions regarding land uses zones, including whether road construction is permitted, are linked to issues concerning wilderness designation and preservation. When the Forest Service chooses not to designate a roadless area as wilderness, that area will be managed as a non-wilderness until at least the next revision of the forest plans, i.e., for ten to fifteen years. A decision to allow road construction or development on a roadless area is significant because it is more difficult, when it is possible at all, to recover wilderness after it has been developed.[10] Plaintiffs allege that the FEIS

failed to take a hard look at the characteristics of the current IRAs, the effects of the forest plans' zoning decisions on future wilderness values, and the impacts of the forest plans' allocation decisions upon environmental justice considerations.

>        1.        Specificity of Information Provided for Roadless Areas

California argues that the FEIS fails to provide even general information on affected roadless areas, in violation of the NEPA.  California relies upon <u>California v. Block</u>, 690 F.2d 753 (9th Cir. 1982).  In that case, the court held that the final EIS supporting the Forest Service's Roadless Area Review and Evaluation II ("RARE II") project failed to meet the requirements of the NEPA. RARE II inventoried all roadless areas within the National Forest System and allocated each area to one of three planning categories: wilderness, further planning or non-wilderness.  <u>Id.</u> at 758.  The court held that the EIS in that case reflected "only a feeble attempt" to comply with the CEQ requirement that the proposing agency describe the environment of the area affected as it existed prior to the proposed action.[11]  <u>Id.</u> at 763.  The EIS at issue in <u>Block</u> was held inadequate even though "[f]or each area in the RARE II inventory, the EIS contain[ed] a two page computer print-out which list[ed]: (1) the location and acreage of the area; (2) its classification as one of forty basic landform types; (3) its Bailey-Kuchler classification as to ecosystem type; (4) the number of wilderness-associated wildlife species in the area; and (5) a competitive numerical rating score of each area's wilderness attributes."  <u>Id.</u>  Despite the inclusion of this information, the court found that the descriptions failed to "identify the distinguishing wilderness characteristics of each area."  <u>Id.</u>  In that case, the Forest Service stressed two facts, namely that the decisions could be revisited in ten to fifteen years, and that the RARE II process was only the first step in a multi-stage planning process. <u>Id.</u> at 762.  The court was unpersuaded, holding that "the 'critical decision' to commit these areas for non-wilderness uses, at least for the next ten to fifteen years, is 'irreversible and irretrievable.'"  <u>Id.</u> at 763.

The Forest Service does not deny that the only information disclosed about roadless areas in the text of the FEIS document itself is their gross acreage.  This level of information, standing alone, would fall far below the level found to be inadequate in <u>Block</u>, as it does not "identify the

20

1    distinguishing wilderness characteristics of each area." <u>See</u> <u>id.</u> at 763.  The Forest Service pointed

2    out for the first time at the motion hearing that Appendix D of the FEIS, which pertains to IRAs,

3    incorporates by reference a "Wilderness Evaluations" document found on the Forest Service's public

4    website.  <u>See</u> FEIS, vol. 2 at 153 ("See 'Wilderness Evaluations' on the southern California Forest

5    Plan Revisions website, www.fs.fed.us/r5/scfpr/read, for a full description and specific analysis of

6    all areas.").  This 370-page document specifically describes the environment of each IRA.  Plaintiffs

7    responded that (1) the analysis should be found in the EIS itself and (2) even so, the more detailed

8    materials available online do not provide the information required by the NEPA.

9        As regards the first argument, it is reasonable for the Forest Service to incorporate

10   documents into an EIS by reference when doing so will cut down on bulk without impeding review

11   of the action and the referenced materials remain reasonably available for inspection by interested

12   persons.  <u>See</u> <u>City of Sausalito v. O'Neill</u>, 386 F.3d 1186, 1214 (9th Cir. 2004).  Plaintiffs conceded

13   at the motion hearing that they have had no problem accessing this information.[12]  As regards the

14   second argument, environmental plaintiffs assert that the FEIS should provide more detailed

15   analyses of impacts of the forest plans upon each IRA.  In the court's judgment, the FEIS's analysis

16   of impacts coupled with the detailed descriptions of the various IRAs is sufficient to meet the NEPA.

17   The court concludes that the FEIS does not, in this regard, fail to foster informed decision making

18   and public participation regarding the zoning of IRAs in the four forests.  <u>See</u> <u>Block</u>, 690 F.2d at

19   761.

20                    2.    Analysis of Zoning Decisions on Future Wilderness Values

21       Environmental plaintiffs allege that the FEIS does not disclose the consequences of

22   foreclosing wilderness designations, while simultaneously zoning for possible road construction in

23   IRAs, on the scale which the plans envision.  Environmental plaintiffs emphasize the interplay

24   between the potential for encroachment on IRAs and how this affects opportunities for future

25   wilderness designations.  By way of background, the IRAs are areas with relatively little human

26   presence.  An IRA can be designated as wilderness, in which case it will remain protected as a wild

27   area in perpetuity; it can be zoned in ways that allow increased human development, in which case it

28
                                        21

may lose its wilderness value forever; or it may remain an IRA until it is someday designated as wilderness or designated as an area in which roads and development will be allowed to a greater or lesser degree. By their nature, the IRAs are prizes coveted by various constituencies. Some conservationists would prefer for most or all IRAs to be designated as wilderness areas so that they will retain their wild character in perpetuity. Other users of the forests would prefer for most IRAs to be opened to development, to allow greater opportunities for certain types of recreational use or economic development. Each time the Forest Service issues a programmatic forest plan, it must strike a balance between the competing uses. Under the NEPA, it must fully and fairly discuss the tradeoffs it has reached.

Environmental plaintiffs complain that the forest plans designate over 942,000 acres of IRAs to land use zones that allow road construction or other activities that could permanently impair those areas' suitability for future wilderness designation, while choosing to recommend only about 79,000 acres for wilderness designation. See FEIS, vol. 2 at 170, tbl.541. The Forest Service notes that the FEIS discusses both wilderness designations and the forest plans' effects on roadless characteristics and values. See, e.g., FEIS, vol. 1 at 280-281, 296, 336, 510, 517-520, 554, vol. 2 at 381, 422, 470-476. In these discussions, the FEIS provides substantial analysis of issues concerning roadless areas and wilderness designations. It does not, however, specifically analyze the cumulative impact or overall consequences to the forests or the national forest unit of extensively increasing the IRAs zoned to allow for potential road construction while recommending relatively few IRAs for wilderness protection.

The Forest Service has made much of the fact that the forest plans at issue are programmatic rather than site-specific. The cumulative impacts and interplay of the decisions made in the forest plans constitute precisely the sort of high-level strategic consideration that must be analyzed in a programmatic EIS. If the larger picture is not addressed at this level, it never will be, because site-specific plans do not have the scope appropriate to review the holistic impacts of land use zoning and wilderness designation decisions on the national forest unit or the individual forests as a whole. The Forest Service abused its discretion by failing to address this issue in the FEIS.

1

2                 3.       Environmental Justice Analysis

3       An EIS must disclose the effects of a proposed action, including "cultural, economic, social,

4 or health [effects]." 40 C.F.R § 1508.8. According to environmental plaintiffs, an agency must

5 consider whether an action will have a disproportionate effect on minority or low income

6 populations, and the FEIS fails to do so. Specifically, environmental plaintiffs charge that the FEIS

7 fails to discuss the possibility that building more roads in the national forests disproportionately

8 harms Latinos. Environmental plaintiffs concede that statistics reveal a pattern of greater overall use

9 by Latinos of developed recreation areas rather than wilderness, relative to Anglos. Environmental

10 plaintiffs nevertheless assert that the way to improve Latino communities' ability to access the

11 natural beauty of the forests is to preserve large amounts of undisturbed roadless areas.

12       The remarkable logic of environmental plaintiffs' argument aside, the court cannot conclude

13 that the FEIS fails to recognize and analyze the issue of disproportionate effects of the forest plans

14 on minority ethnic and demographic groups. This topic is dealt with in several places in the FEIS.

15 See, e.g., FEIS, vol. 1 at 15, 230-238, 245, 473-475. Indeed, the FEIS notes:

16         Visitation data from [National Visitor Use Monitoring] show that participation in
        wilderness hiking has a low rate of participation by non-whites and is not reflective of
17         the demographic mix of the surrounding populations. Rather, the NVUM data
        suggest that non-whites are more inclined to utilize the developed recreation
18         facilities. It might be supposed that alternatives with greatest emphasis on wilderness
        (such as Alternatives 3 and 6) are therefore discriminatory against non-whites.
19

20 Id. at 474. The FEIS includes consideration of potentially disproportionate effects on minority and

21 demographic groups sufficient to meet the requirements of the NEPA.

22         B.       Reasonable Range of Alternatives

23       Plaintiffs allege that the Forest Service failed to include a reasonable range of alternatives in

24 the FEIS. The NEPA provides that an agency must include in an EIS "a detailed statement by the

25 responsible official on . . . (iii) alternatives to the proposed action." 42 U.S.C. § 4332(C). The

26 agency must, among other things, "[r]igorously explore and objectively evaluate all reasonable

27 alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the

28 reasons for their having been eliminated." 40 C.F.R. § 1502.14. The discussion of alternatives "is

the heart of the environmental impact statement." Id.; Friends of Yosemite Valley v. Kempthorne, 520 F.3d 1024, 1038 (9th Cir. 2008). "The existence of a viable but unexamined alternative renders the environmental impact statement inadequate. An agency must look at every reasonable alternative, with the range dictated by the nature and scope of the proposed action, and sufficient to permit a reasoned choice." Friends of Yosemite, 520 F.3d at 1038 (quoting Alaska Wilderness Recreation & Tourism Ass'n v. Morrison, 67 F.3d 723, 729 (9th Cir. 1995)). "An agency is under no obligation to consider every possible alternative to a proposed action, nor must it consider alternatives that are unlikely to be implemented or those inconsistent with its basic policy objectives." Seattle Audubon Soc'y v. Moseley, 80 F.3d 1401, 1404 (9th Cir. 1996). The court is to apply a "rule of reason" standard to determine whether the NEPA has been violated. Friends of Yosemite, 520 F.3d at 1038. The "touchstone" of the inquiry is "whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation." Headwaters, Inc. v. Bureau of Land Mgmt., 914 F.2d 1174, 1180 (9th Cir. 1990) (quoting Block, 690 F.2d at 766). Plaintiffs argue that the Forest Service failed to present a reasonable range of alternatives because the FEIS contained no analysis of alternatives for two decisions made in the forest plans: the requirements for monitoring and evaluation of plan implementation, and the choice of management indicator species.

The FEIS analyzes seven alternatives, numbered 1, 2, 3, 4, 4a, 5 and 6. See FEIS, vol. 1 at 24-60. Alternative 1 was the "no action" alternative. See 40 C.F.R. § 1502.14(d) ("[A]gencies shall . . . [i]nclude the alternative of no action."). The alternative chosen by the Forest Service was Alternative 4a. Alternative 6 was, according to the Forest Service, modeled upon a proposed alternative jointly developed by a number of environmental groups, including instant plaintiffs, and submitted to the Forest Service for consideration. All parties refer to the environmental groups' proposal as the "Conservation Alternative." See 3.2.4.40 ("Conservation Alternative"). Plaintiffs dispute the characterization of Alternative 6 as a minor variant of the Conservation Alternative, arguing that Alternative 6 stripped key components out of the Conservation Alternative, specifically the latter's management standards and monitoring and evaluation measures. The Forest Service

contends that these components of the Conservation Alternative were "inconsistent with [the] basic policy objectives" of the agency. See Seattle Audubon, 80 F.3d at 1404. Specifically, the Conservation Alternative rejected the Forest Service's "adaptive management" approach, calling it "one of the most abused concepts in current natural resource management." Conservation Alternative at 360. The Forest Service argues that it was not required to adopt, or separately analyze in depth, the Conservation Alternative or its monitoring requirements.

To the extent that plaintiffs argue the Forest Service should have considered management theories other than adaptive management, the court agrees that plaintiffs are asking the agency to consider alternatives incompatible with the agency's basic policy objectives. The Forest Service has presented convincing evidence that it views the adoption of an adaptive management strategy for the national forests as a fundamental policy choice to achieve the agency's objectives. Moreover, there is no question that the law did not require the Forest Service to adopt the Conservation Alternative as such. The only question is whether the specific decision to use identical monitoring indicators for every alternative analyzed in the FEIS, see FEIS, vol. 1 at 68, was an abuse of discretion because it failed to foster informed decision-making and informed public participation.

The Forest Service does not dispute that monitoring and evaluation standards have significant importance in the overall forest planning scheme. The FEIS itself stresses their importance. According to the FEIS, "A forest plan makes six fundamental decisions, including: . . . [t]he establishment of monitoring and evaluation requirements for plan implementation." FEIS, vol. 1 at 18.[13] The forest plans also emphasize the importance of monitoring and evaluation decisions in forest planning, describing monitoring and evaluation as "the linchpin for the success of an adaptive approach to national forest management." Forest Plans, Part 1, at 5. The forest plans state further: "Adaptive management is the foundation for planning and management [of the forests] . . . . Monitoring and evaluation are critical to adaptive management." Forest Plans, Part 3 at 57. By the terms of the FEIS and forest plans themselves, the requirements for monitoring and evaluation are of fundamental and critical importance.

25

Despite the criticality of monitoring and evaluation requirements, the Forest Service proposed the same set monitoring and evaluation indicators for every alternative. FEIS, vol. 1 at 68. These indicators are listed in Appendix C of the forest plans' Part 3. Fifteen "monitoring questions" are listed, along with designations of measuring frequency and reporting periods. For instance, one monitoring question is: "Are the national forests' inventory of invasive plants and animals showing a stable or decreasing trend in acres of invasives?" According to the chart, the measuring frequency for this question is one year while the report period is five years. Forest Plans, Part 3 at 58; see also FEIS, vol. 1 at 72 (same chart). These specific questions lay out what will be monitored and how often. The FEIS presents no alternative to the suite of questions and monitoring requirements set forth. To be sure, the Forest Service need not present every conceivable combination of possible monitoring and evaluation requirements; however, for an issue as critical as this one, the FEIS must set forth at least some alternatives. If, for example, monitoring represents substantial costs to the Forest Service, the FEIS might compare a lower-cost monitoring regime (perhaps monitoring a smaller number of questions or monitoring less frequently) to a more extensive, higher-cost monitoring regime, discussing the tradeoffs it might require.[14] As written, the FEIS describes monitoring and evaluation as the "linchpin" of the Forest Service's management strategy but fails to provide any alternatives whatsoever. The failure to present any alternatives pertaining to a critical decision violates the NEPA.

The cases relied upon by the Forest Service do not hold to the contrary. The Forest Service quotes Seattle Audubon Soc'y v. Moseley, 80 F.3d 1401, 1404 (9th Cir. 1996) (per curiam), for the proposition that an agency need not consider "alternatives that are unlikely to be implemented or those inconsistent with its basic policy objectives." In that case, the court found that a forest plan covering the range of the endangered spotted owl contained a reasonable range of alternatives despite failing to include a "no action" scenario, because such a scenario would have been inconsistent with the plan's policy goal of finding a balance between competing uses. Id. In the instant action, the Forest Service need not reject its adaptive management philosophy to consider

26

1   whether the proposed fifteen specific monitoring questions and their respective monitoring periods

2   are optimal in relation to other reasonable alternatives.

3       The Forest Service also quotes language from <u>Resources Ltd. v. Robertson</u>, 35 F.3d 1300,

4   1307 (9th Cir. 1993), and <u>Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council</u>, 435

5   U.S. 519, 551 (1978), to support its contention that the Forest Service need not consider every

6   possible alternative—a requirement that would force the agency to generate countless alternatives.

7   The Forest Service is correct that it is allowed to use criteria to limit the number of alternatives.

8   This does not mean that the Forest Service can refuse to analyze any reasonable alternative

9   whatsoever pertaining to the "linchpin" of its management strategy.  While the <u>Resources Ltd.</u> court

10  found the Forest Service to have met its burden under the NEPA in that case, it should be noted that

11  the Forest Service had developed seventeen separate alternatives.  35 F.3d at 1307.  Here, the Forest

12  Service applies the same monitoring and evaluation requirements across the range of alternatives.

13  The failure to analyze alternative regimes of monitoring and evaluation renders the public and

14  decision makers unable to make a reasoned choice; it is an abuse of discretion and a violation of the

15  NEPA.

16      Environmental plaintiffs also challenge the Forest Service's decision to select the same

17  "management indicator species" across all alternatives presented.  The Forest Service selected

18  twelve such species, <u>see</u> FEIS, vol. 1 at 177-178, whose "population changes are believed to indicate

19  the effects of management activities," 36 C.F.R. § 219.19(a)(1) (1982).  Environmental plaintiffs

20  object to the species chosen and argue that the Forest Service did not present any alternative

21  management indicator species.  As noted, the Forest Service is not required to analyze every

22  conceivable alternative.  Less significant choices may be held constant across alternatives so that an

23  agency is not compelled to analyze a prohibitively large number of alternatives.  The court finds that

24  environmental plaintiffs have not adequately substantiated their contention that the choice of

25  management indicator species is so significant that the NEPA requires the Forest Service to present

26  alternative species.[15]

27      C.   <u>Off-Highway Vehicle (OHV) Use</u>

28

27

1   According to plaintiffs, the FEIS does not include a full and fair discussion of the adverse

2   impacts of expanding OHV use in the four forests, instead impermissibly deferring discussion of

3   possible mitigation to later, site-specific plans.  The Forest Service challenges plaintiffs' premise,

4   arguing that the plans do not in fact call for increased OHV use in the forests.  It also argues that the

5   FEIS's analysis of the forest plans' impact is more than adequate.

6       The forest plans describe a strategy that would make "[s]mall changes in land use zoning

7   [that] emphasize longer distance riding opportunities or that connect isolated sections of route

8   together."  FEIS, vol. 1 at 551-552.  According to the FEIS, the development of "some loop trails

9   and trail segment connections between current use areas" could result in "a higher level of user

10  satisfaction" and accordingly "less creation of unauthorized routes."  Id. at 356.  The premise of this

11  approach is that the current configuration of routes permitting OHV travel provides too few

12  connections between routes.  This circumstance frequently makes it attractive for OHV drivers to cut

13  through territory in which OHVs are not permitted, damaging the ecology, in order to transit from

14  one OHV route to another.  The FEIS describes the approach articulated by Alternative 4a as

15  "provid[ing] for limited expansion of the road and trail system to make logical connections that

16  better serve the public and protect[] natural resources."  Id. at 320.  Plaintiffs consider these steps to

17  constitute a decision to allow a "significant" increase in OHV use, and argue that the Forest Service

18  should have included a discussion of mitigation factors.  According to plaintiffs, such a discussion

19  should have analyzed ways to mitigate adverse impacts of the increase in OHV use, discussed how

20  new trails would be policed, and analyzed the effects of planning for discretionary, rather than

21  mandatory, rehabilitation of unauthorized OHV trails.

22      The Forest Service must provide a "full and fair discussion of significant environmental

23  impacts" of the action.  40 C.F.R. § 1502.1.  The comparison of alternatives in an EIS must

24  "[i]nclude appropriate mitigation measures not already included in the proposed action or

25  alternatives."  Id. § 1502.14(f).  The FEIS contains substantial discussion of the issues involved in

26  OHV use under the plan alternatives.  See, e.g., FEIS, vol. 1 at 354-356, 435-436, 549-555.

27  Plaintiffs spend some time in their briefs highlighting the negative impacts of OHV use to

28

1   ecosystems in the forests; however, the question is not whether the forest plans and FEIS have come

2   to the right conclusions but whether they have met the requirements of the NEPA.  Plaintiffs have

3   pointed to nothing in the record that contradicts the Forest Service's explanation of its approach as

4   described above.  Considering the relatively modest alterations to OHV usage described and the

5   relatively narrow scope of the court's review under the APA, the court finds that plaintiffs have

6   failed to meet their burden of showing that the impacts in question are "significant environmental

7   impacts" for the purposes of the regulations or that the types of mitigation measures they insist

8   should have been discussed are "appropriate" such that the Forest Service was required to discuss

9   them.  The fact that these forest plans are programmatic in nature is not a trump protecting them

10  from every challenge; however, the question of how far a plan is removed from a concrete project is

11  relevant to determining the degree of specificity with which an agency must set forth impacts and

12  mitigation measures.  No matter how fulsome an EIS may be, a challenger can always pick out

13  issues of increasing specificity that were not analyzed.  Perhaps there would have been some benefit

14  in discussing in greater detail measures to mitigate the damage caused by OHV, but the court cannot

15  say that the analysis fails to meet the requirements of the NEPA.  It may also be noted that the

16  changes made in the plans are themselves intended to be mitigation measures to the extent that

17  making logical connections between trails may be expected to minimize OHV use in unauthorized

18  areas.

19          Plaintiffs also challenge the basis for such an expectation, arguing that the relationship

20  advanced by the Forest Service between disconnected OHV trails and unauthorized use is

21  inadequately supported.  This assumption is discussed in several places in the FEIS, and it is an

22  argument that the public and decision makers have some common sense basis to evaluate.  The court

23  finds that, regardless of whether or not the Forest Service's approach will ultimately be judged

24  effective, the FEIS contains a discussion of the impacts that is full and fair enough to withstand

25  challenge under the NEPA.[16]

26          D.      Mitigating the Effects of Potential Oil and Gas Drilling on the California Condor

27

28

1    Prior to the issuance of the FEIS at issue in this case, the Forest Service had completed a

2    separate Oil and Gas Drilling FEIS for the Los Padres National Forest ("Oil and Gas FEIS").  The

3    FEIS incorporates the Oil and Gas FEIS by reference, adopting its findings and analysis of impacts

4    of oil and gas drilling.  This includes analysis of impacts to the California Condor, an endangered

5    species that at one time existed in captive breeding only but has now been released back into the

6    wild at several locations within Los Padres National Forest.  According to California, the Oil and

7    Gas FEIS's analysis of impacts and potential mitigation measures is insufficient under the NEPA.

8    The Forest Service points out that the forest plans are programmatic in nature and that no land can

9    actually be leased for oil and gas exploration until completion of a multi-step decision-making

10   process involving the Forest Service, the Bureau of Land Management and any potential operator.

11   The adequacy of the Oil and Gas FEIS is already being challenged in another district court.

12   See Ctr. for Biological Diversity, et al. v. Weingardt (E.D. Cal., Case No. C 07-0770).  Accordingly,

13   the Forest Service invites the court to refuse to review California's instant challenge in the interests

14   of comity and judicial efficiency.  The court accepts this invitation.  California filed an

15   administrative appeal of the Oil and Gas FEIS.  Should California have wished to challenge the Oil

16   and Gas EIS in federal court, it has had ample opportunity to join the pending litigation or file a

17   related action in the Eastern District of California.  In the interests of comity and judicial efficiency,

18   the court declines to reach California's challenge to the Oil and Gas FEIS.[17]

19       E.    Fuels Reduction Activities

20   The Forest Service works to manage the danger of forest fires, which have frequently

21   threatened developed areas in southern California.  A method of managing such danger is "fuels

22   reduction," which the Forest Service defines as follows: "Manipulation, including combustion or

23   removal of fuels to reduce the likelihood of ignition and/or to lessen potential damage and resistance

24   to control.  Often includes thinning and/or prescribed burning."  Forest Plans, Part 3 at 96.  The fuels

25   in the four forests to be reduced include large trees and various plants and shrubs that comprise

26   chaparral.  According to environmental plaintiffs, the FEIS does not include a full and fair

27   discussion of the adverse impacts of the forest plans' approach to fuels reduction activities.

28

1  Specifically, environmental plaintiffs assert that the FEIS fails to adequately discuss the adverse

2  impacts of fuel management on chaparral and large, fire-resistant trees.

3      The thrust of environmental plaintiffs' argument is that the forest plans codify an aggressive

4  plan to allow more logging of trees and clearing of chaparral than is necessary to protect

5  communities at risk from forest fires. Environmental plaintiffs attempt to frame their objections as

6  procedural violations, but fail to do so. The FEIS contains a thorough and substantive analysis of

7  the impact of fuels reduction activities. See FEIS, vol. 1 at 314-321, 330-335. It is plain that

8  environmental plaintiffs disagree with the Forest Service's strategy, but they fail to show that the

9  Forest Service has abused its discretion or acted in an arbitrary and capricious manner in fashioning

10 its analysis of fuels reduction activities. Environmental plaintiffs would have the Forest Service

11 specify a precise minimum diameter for any trees subject to logging pursuant to the forest plans'

12 fuels management strategy, but environmental plaintiffs have not articulated a persuasive reason to

13 conclude that this level of detail is appropriate for a programmatic plan. The court finds no abuse of

14 discretion in relation to the FEIS's analysis of fuels reduction activities.

15

16 CONCLUSION

17     Plaintiffs' motions for summary judgment are GRANTED IN PART and DENIED IN PART.

18 Defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART. The

19 final environmental impact statement at issue in this action was issued in violation of the NFMA and

20 NEPA, although not for all of the reasons advanced by plaintiffs. Plaintiffs and defendants shall file,

21 within thirty-five (35) days of entry of this order, simultaneous briefs, not to exceed twenty (20)

22 pages each, proposing appropriate form(s) of relief to remedy the deficiencies identified in the FEIS

23 by this opinion. Simultaneous reply briefs, not to exceed fifteen (15) pages each, shall be filed

24 within forty-nine (49) days of entry of this order.

25     IT IS SO ORDERED.

26

27

28 Dated: September 29, 2009

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

1.     This agency recently changed its name from "California Resources Agency" to "California Natural Resources Agency." Its authority and duties are, for all relevant purposes, unchanged. <u>See</u> Cal. Stat. 2008, ch. 205.

2.     Thomas Vilsack is automatically substituted for his predecessor, Edward Schafer, pursuant to Federal Rule of Civil Procedure 25(d).

3.     Counsel for the Forest Service submitted the administrative record on data disks. In the future, counsel shall also provide chambers copies of documents frequently referenced in the briefing.

4.     The Forest Service argues that California "neglects to follow the procedure used by the State of Massachusetts" in <u>Massachusetts v. Environ. Prot. Agency</u> to establish standing. The Forest Service appears to argue that California must submit declarations to establish a concrete injury, just as Massachusetts submitted declarations that global warming was expected to affect state-owned coastal property. The fact that Massachusetts was a landowner neighboring the ocean strengthened its contention that regulation of carbon emissions, and the resulting effects on the sea level, affected Massachusetts's interests. 549 U.S. at 522-523. The Court did not hold that Massachusetts was required to submit declarations attesting to the affects of global warming as a neighboring landowner; it merely found that those declarations bolstered the case for standing. Moreover, the instant case is distinguishable because, unlike rising ocean levels, the natural resources within a state's borders are something in which a state self-evidently has a stake. <u>See</u> <u>Sierra Forest Legacy</u>, 526 F.3d at 1234.

5.     Insofar as the Forest Service challenges California's and environmental plaintiffs' standing to bring their respective NEPA claims, <u>see</u> Case No. C 08-1185, Docket No. 50 (Def.'s Mot./Opp.) at 23, that challenge fails under for the same reasons discussed above. Environmental plaintiffs have submitted several declarations demonstrating that members of their organizations have concrete interests in the four forests and specific areas of the forests. <u>See</u> Case No. C 08-3884, Docket No. 28 (exhibits). These are sufficient to show standing. <u>See</u> <u>Citizens for Better Forestry</u>, 341 F.3d at 972.
    The Forest Service objects to parts of environmental plaintiffs' declarations that it characterizes as legal argument and inappropriate attempts to expand the record. <u>See</u> Case No. C 08-3884, Docket No. 36 (Motion to Strike). The declarations do contain information extraneous to the issue of standing, and the court disregards the contents of the declarations except insofar as they have relevance to that issue.

6.     The <u>Bowen</u> court left open the possibility that it might conceivably "sanction departure from this principle in some cases," but did not do so in that case. 488 U.S. at 212. Even if such a course were available to this court, there is no reason to do so in the instant case, where there are detailed regulations implementing the statute. Moreover <u>Bowen</u> cannot be distinguished from the instant case on the basis of its facts.

7.     Justice Powell's dissenting discussion of section 1604(a) in <u>California Coastal Comm'n v. Granite Rock Co.</u>, 480 U.S. 572 (1987), does not affect this conclusion. The Forest Service makes much of Justice Powell's comment that the Federal Land Policy and Management Act of 1976, which contains a slightly more stringent requirement for coordination with states, "only requires the Secretary to listen to the states, not obey them." <u>Id.</u> at 596. This comment, which was dicta and not part of the opinion of the court, would undoubtedly also apply to the NFMA. Yet California does not argue that the Secretary of Agriculture was required to obey it, and simply stating that the Secretary must "listen to" California provides no additional guidance. In the absence of controlling law to the contrary, the court looks to agency regulations, which are entitled to <u>Chevron</u> deference, for guidance about what it means to "coordinate with" the states.

8.     As the Forest Service points out, this obligation does not on its face require that the Forest Service "reconcile . . . any inconsistencies," as in California's characterization.

9.     Nothing in the regulations indicates that California was required to submit its comments during the public comment period.  Public participation and coordination with other government entities are regulated by different provisions of the 1982 regulations.  Compare 36 C.F.R. § 219.6 (1982) (public participation) with id. § 219.7 (coordination with other public planning efforts).

10.     These facts are not in material dispute.

11.     The Block court held that the EIS did not meet the requirements in the applicable CEQ guidelines.  690 F.2d at 763.  The Forest Service attempts to distinguish Block on its facts but does not argue that any intervening change in CEQ guidelines has affected Block's holding.

12.     One must, however, hunt around on the Forest Service's website to find it, as the link cited in the FEIS is broken as of this time.  The current correct link is www.fs.fed.us/r5/scfpr/projects/lmp/docs/ira-and-wilderness.pdf.  The Forest Service would do well to ensure that individuals who search at the internet address listed in the FEIS are able to find the document from that address.

13.     The FEIS also states: "The adoption of a land management plan includes six decisions for the long-term management of a national forest. These decisions are: . . . 4. The establishment of the monitoring and evaluation requirements for implementation of the forest plans as required by 36 CFR 219.11(d).  Monitoring and evaluation questions are listed under each desired condition in Part 1 of the forest plans and in a separate monitoring section in Parts 2 and 3."  FEIS, vol. 1 at 6-7.

14.     The Forest Service might also, for instance, consider including a monitoring and evaluation requirement to gauge whether its strategy to decrease unauthorized Off-Highway Vehicle (OHV) use is proving effective.  The OHV issue is discussed infra.

15.     Environmental plaintiffs also argue that the FEIS fails to analyze comprehensive management standards designed to protect each individually-identifiable plant community.  The court finds that environmental plaintiffs have inadequately substantiated their argument that the NEPA requires this level of specificity at the LRMP stage.

16.     The court did not consider two documents that the Forest Service cited to bolster its case that its strategy had scientific support, AR 3.7.14.12 and AR 4.6.9.21.  Unlike most other key documents, these were not electronically linked to the index of the administrative record provided, and they were not readily discoverable within the various data disks submitted by the Forest Service.  It is not the court's task to scour a voluminous administrative record in a time-consuming quest for a cited document.  See Orr v. Bank of America, NT & SA, 285 F.3d 764, 774-775 (9th Cir. 2003) (and cases cited therein); Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996).

17.     California argues that the Forest Service was unjustified in relying on the Oil and Gas FEIS in its development of the forest plans' FEIS because the former was subject to an ongoing legal challenge.  EISs are routinely challenged in the federal courts.  California cites no authority for the proposition that the mere initiation of a legal challenge should essentially nullify an EIS.